Andrew Jackson DUCKETT,
Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 330–88.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 10, 1990.

Richard Alley (court appointed on appeal only), Fort Worth, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall, Delonia A. Watson, Brent Carr, Paul

Dickson and David K. Chapman, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of the offense of indecency with a child. V.T.C.A., Penal Code § 21.11(a)(1). Punishment, enhanced by two prior felony convictions, was assessed at 80 years in the Texas Department of Corrections.[1]

On direct appeal, appellant challenged his conviction in four points of error. In the fourth and sole point of error reviewed by the Court of Appeals, it was argued the trial court committed reversible error when it permitted an expert witness employed by the Department of Human Services to testify concerning the dynamics of intrafamily child sexual abuse. Relying on this Court's decision in *Hopkins v. State*, 480 S.W.2d 212 (Tex.Cr.App.1972), the Court of Appeals in an unpublished opinion concluded the expert opinion was not admissible under the Texas Rules of Criminal Evidence Rule 702.[2] *Duckett v. State*, No. 2–86–217–CR (Tex.App.–Ft. Worth, delivered February 17, 1988). The cause was remanded for a new trial. We granted the State's petition for discretionary review to determine whether the appeals court erred in holding the trial court abused its discretion in admitting expert testimony regarding intrafamily sexual abuse of young children.[3] We will reverse the judgment of the Court of Appeals.

At trial, the six and one-half year old child complainant, S___ S___, testified she was in the bathroom when her uncle, the appellant, entered, removed her clothes, and rubbed her genitalia with his hands and penis. On cross-examination, the defense established the complainant had testified differently on direct examination than she had during her videotaped interview about two years earlier.[4] During the videotaping session on September 14, 1984, S___ S___ had stated it was her birthday. Defense counsel brought out through her testimony that her birthday was in fact in the month of November, but her mother had promised her "presents" if she would meet with Jackie Smith, a police investigator and videotape operator. A second inconsistency was that S___ S___ identified appellant as the perpetrator at trial, but admitted on cross-examination she had previously named "Lawrence", as well as "Junior", as the individual committing the assault.[5] She had told the authorities on tape both she and appellant were partially clothed. At trial, she stated he had taken both their clothes off before touching her. There was an additional discrepancy in that the child had previously told the authorities appellant threatened to "wring her neck" if she told anyone of his conduct, while at trial she stated appellant threatened to burn her with cigarettes and stab her with a knife. The child's testimony was clear in naming appellant as the perpetrator, but she did have some difficulty in remembering certain facts or events about which she had made statements during the earlier video session.

---

1. Now the Texas Department of Criminal Justice, Institutional Division.

2. The court went on to state even if it were to join the "small number of jurisdictions" that permit expert testimony of this kind in child sexual abuse cases, the case would still have to be remanded for another trial since the expert's opinion was offered without benefit of a personal interview with the child. The expert had listened to testimony in court and was given access to the police report and a videotape made by the complaining witness.

3. *See* Tex.R.App.P. 200(c)(2).

4. An interview with the child complainant was videotaped on September 14, 1984. Although the tape was not admitted at trial, both the State and defense made numerous references to statements made by the complainant on the tape. The inconsistencies between the child's taped statements and her trial testimony were part of the focus of the expert witness's testimony.

5. Appellant was also known as "Junior". The complainant's step-father was named "Lawrence".

The complainant's mother also took the stand for the State. Patsy S___ testified she went to the doctor on September 10, 1984, leaving S___ S___ in the care of her brother. She noticed nothing unusual that night when she returned home. In the morning, however, her daughter complained of itching and irritation of the vagina. Responding to the complaint, she took the child to the doctor. According to Patsy, the doctor informed her S___ S___ had been molested, to which Patsy stated, "Oh my God." Although she told her husband about the incident that night, she did not call the authorities until the next day, because that was the day set for appellant's regular meeting with his parole officer. In response to questions by both sides, Patsy admitted to having been convicted of murder in 1974 and having lost parental rights to both children living at that time with her. She also admitted one of these children had been sexually abused by her father. Contrary to S___ S___'s testimony, Patsy denied her daughter usually slept in the same bed with her and her husband.

The defense was able to cast doubt on the credibility of the complainant and her mother through cross examination of the physician who examined S___ S___. Dr. Robert Casanova testified he gave the child a general and pediatric pelvic examination which showed nothing out of the ordinary. S___ S___ told him the itching and irritation had been going on for some time, but did not mention she had been molested. Casanova stated he did not tell Patsy the child had been molested and did not recall

her saying, "Oh my God." He did not report the results of his examination because he did not believe the child had been sexually molested.

To counter this potentially damaging testimony to its case, the State called John Brogden, a certified social worker and advanced clinical practitioner who also holds a certificate as an instructor with the Texas Commission on Law Enforcement Officer's Standards and Education in the area of child sexual abuse investigation. Brogden testified children who are sexually abused almost always go through certain phases over the period of time of abuse and in its aftermath.[6] After discussing each phase or "element", Brogden then proceeded to apply these abstract elements to the particulars of the instant case. Establishing that the expert had heard the various witnesses testify, had read the police reports and viewed the videotaped interview taken with the complainant, Brogden was asked whether he "found any of these elements in this case?" Over defense objection that allowing such testimony would constitute an invasion of the province of the jury, bolstering of the State's witness and was both prejudicial and immaterial to the case, Brogden was permitted to opine he found every element existing in the case. Questioning thereafter focused first on the individual element or phase in terms of manifestations in general, and second, specific questions regarding manifestations illustrating the particular phase in the case at bar. He was asked to give his opinion why abuse victims in general would fail to

---

**6.** Brogden testified certain "elements" or "phases" occur in nearly every child sexual abuse case. The first is the "access and opportunity period" of time in which the offender has the opportunity to be alone with the child. The second is the "sexual engagement phase", where multiple events of a sexual nature occur to the child. The third phase, occurring during this period of time, was described as "conditioning", where the child is literally conditioned to accept the overtures and advances by direct threat or more subtle methods, so that the child sees the conduct as acceptable. Another key element along with conditioning is the offender's need for secrecy. The child is given instructions, reinforced by some level of coercion, to remain silent concerning the offender's advances. As a result of this coercion, the child often becomes confused and may repress or become aggravated with the situation. Typically, such confusion will be followed at some point by the "disclosure phase", wherein the offender's conduct is either accidentally disclosed by third party observation of the child's or offender's behavior, or "purposeful disclosure" by the child him or herself. After the abuse is reported to the authorities, the child enters the final "suppression-repression phase", wherein the offender or his allies attempt to suppress or alter the facts in the child's own mind.

report improper sexual advances, and testified children often indirectly report abuse by way of complaining of physical ailments in the area of the genitalia. The State then questioned Brogden specifically as to whether he had "seen some manifestation of that (indirect report) in this case?" Again overruling the same objection as made previously by the defense, the trial court allowed the witness to respond in the affirmative and to further specify S___ S___'s complaints of itching and irritation as evidence demonstrating her manifestation of this element or phase. Element by element and over objection, the State was allowed to question Brogden first in general terms and then solicit his opinion how each element was manifested by specific facts in the instant case. In particular, Brogden was questioned why the complainant would change her recollection of the events between the time of the offense and trial, and whether it was unusual not to discover some physical manifestation of trauma around the genital area. He responded to the first question by stating that forgetfulness is part of the repression phase. To the latter query, Brogden cited certain statistical studies showing in over 80% of child molestation cases, there is no physical evidence of assault. In sum, the witness was permitted not only to identify the six elements or phases but also was allowed to testify how specific facts fit within each abstract element. He was not asked and did not volunteer an opinion whether the complainant was in fact telling the truth.[7] He did explain why children in general would act in a manner consistent with that of S___ S___.

The Court of Appeals, with no guidance from this Court on the subject, examined the admissibility of Brogden's expert testimony under Rule 702 from the standpoint of the effect of the testimony on the State's case and how similar testimony has been treated in the past by this Court, as well as by other jurisdictions. The court noted that although Brogden "did not give these 'elements' a specific name, there can be little doubt he was describing the phenomenon known as the "Child Sexual Abuse Syndrome." Slip at p. 4, citing as authority *People v. Grady*, 133 Misc.2d 211, 506 N.Y.S.2d 922 (N.Y.Sup.Ct.1986). The court recognized the cases cited by the State "represent a small but growing number of jurisdictions that allow psychological and emotional testimony to explain the child's behavior in cases involving sexual abuse."[8] Nevertheless, the court declined to read Rule 702 "as controlling in the State's effort to have us overrule the precedent established by the Court of Criminal Appeals in *Hopkins*." It is that interplay and possible conflict which is the crux of the issue before us and to which we shall now turn.

Admissibility of expert testimony is governed by Tex.R.Crim.Evid. 702 which provides:

---

7. The prosecution came very close to soliciting a direct opinion on whether S___ S___ was telling the truth when Brogden was asked if in his study and experience, "[i]s a child of young age capable of sticking to a fabricated story over a long period of time?" The defense objection was sustained and an instruction to disregard was given. The trial court overruled a motion for mistrial.

8. As noted by the Court of Appeals, the State cited cases supporting its position from Nevada, Oregon, Minnesota and California for the proposition that under Rule 702, expert testimony regarding behavioral characteristics in sexually abused children may be admissible or at least harmless. *See Smith v. State*, 100 Nev. 570, 688 P.2d 326 (1984) (Trial court properly admitted expert testimony to explain delays in reporting contact in intrafamily abuse case); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1982) (Under rule identical to Texas Rule 702, trial court properly admitted social worker's testimony that complainant's behavior was typical of many abuse victims); *State v. Myers*, 359 N.W.2d 604 (Minn.1984) (Where under identical rule as Texas, expert testified concerning general characteristics of abused children and indirectly bolstered complainant's credibility by testifying it was rare for a child to fabricate abusive situations, testimony did not invade province of jury and trial court did not err by admitting evidence); *People v. Roscoe*, 168 Cal. App.3d 1093, 215 Cal.Rptr. 45 (5th Dist.1985) (trial court erred in admitting expert testimony stating complainant diagnosed as abuse victim but error did not affect judgment).

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision whether to allow a witness to testify as an expert is committed to the sound discretion of the trial court. *Pierce v. State*, 777 S.W.2d 399 (Tex.Cr.App.1989), and cases cited therein. In our recent decision in *Pierce*, supra, we had the opportunity to discuss the proper standard for admission of expert testimony under Rule 702 and there agreed with the characterization given the identical rule found in the federal system. The threshold determination for admitting expert testimony is whether the "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ..." *Id.* Judge Campbell, writing for a majority of the Court, pointed out that the drafters of Fed. R.Evid. 702 explained the intent of the rule in the following manner:

Whether the situation is a proper one of the use of expert testimony is to be determined on the basis of assisting the trier. 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' Ladd, Expert

Testimony, 5 Vand.L.R. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918.

*Pierce*, 777 S.W.2d at 414, citing Fed.R. Evid. 702 Advisory Committee note. Since the particular expert knowledge at issue had to do with common perspective, we declined to find the testimony represented "specialized knowledge" within the meaning of the rule; even though the witness' insight into the particular information might have been of some benefit to the jury, it was not the type of testimony found outside the range of a layperson's knowledge.[9]

We also specifically declined to base our decision on our earlier holding in *Hopkins*, supra. As Judge Campbell noted, *Hopkins*, supra, was decided before adoption of our present rules of evidence and thus might be in doubt given the breadth of Rule 702. *Pierce*, 777 S.W.2d 399, 415 at nt. 3. More to the point, the opinion also correctly states the narrow holding in the *Hopkins* case is not at odds with the change in our evidentiary rules.[10]

The *Hopkins* Court, after deciding the benefit of expert psychiatric testimony offered solely for impeachment purposes against a State's witness was not great enough to offset the disadvantages to its admission, held the trial court in that case did not abuse its discretion in excluding the testimony. It is important to note the context in which the issue was decided. The Court, while recognizing expert psychiatric testimony should not automatically be ex-

---

**9.** Pierce argued the expert's testimony could assist the jury in judging the suggestiveness of a lineup in which he was identified as the murderer. In particular, he would have stated when an object is placed next to a larger object, the first object will be perceived to be smaller than its actual size, and vice versa. As the author of the majority opinion noted, such knowledge is not specialized in the context of the rule; it would appear to be well within parameters of common sense attributed to a lay jury.

**10.** If such were the case, Tex.R.Crim.Evid. 101(c) would appear to require that any incon-

sistency between the case law and rule be "removed by reasonable construction." So, too, does new Rule 102 prescribe that the adopted rules of evidence be construed in a manner to secure, *inter alia*, "promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." This would appear to support Judge Campbell's observation in *Pierce* regarding the breadth of Rule 702 as compared with caselaw authority found prior to adoption of the rules.

cluded in all cases, focused on the purpose for which expert testimony is admissible in a criminal case:

> The purpose of expert testimony is to supply knowledge which would not ordinarily be available to the trier of fact. While psychiatric information is not known by most laymen, there is still available to the jury the usual impeachment evidence such as criminal convictions and prior inconsistent statements to assist in the determination of credibility. Thus, unlike the case of highly technical issues, the jury, even without psychiatric testimony will not be left 'in the dark.'

*Hopkins*, 480 S.W.2d at 221. Thus, it may correctly be said the decision in *Hopkins*, supra, was based upon a proposition common in the law both before and after our present rules of evidence were enacted. Expert testimony, to be admissible, must pass the threshold test that it concern a subject upon which the aid of an expert opinion will be of assistance to the trier of fact. Judge Roberts recognized this most basic of predicates in *Hopkins*, supra. *Id.* at 218. Rule 702 is simply a codification of this interpretation. The real question in admitting expert testimony is whether that testimony will assist the jury in reaching a just verdict in the case. Many times the jury may be aided by background information which might tend to explain certain behavior and without which the jury may be "left in the dark." *Hopkins*, supra. Where such testimony is highly specialized or technical in nature, so as to be outside the knowledge of the average layman, a threshhold determination of admissibility under Rule 702 is both proper and consistent with prior case law of this State.

As earlier noted, a growing number of jurisdictions now allow expert testimony to explain behavioral characteristics of children who have suffered sexual abuse. Some jurisdictions would allow such testimony even though there is a direct impact

of bolstering the credibility of the complaining witness due to a description of behaviors usually found in sexually abused children. *State v. Reser*, 244 Kan. 306, 767 P.2d 1277 (1989); *Stephens v. State*, 774 P.2d 60 (Wyo.1989); *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982). *See also State v. Geyman*, 224 Mont. 194, 729 P.2d 475 (1986); *State v. Saldana*, 324 N.W.2d 227 (Minn.1982) and *State v. McGee*, 324 N.W.2d 232 (Minn.1982) (convictions reversed where expert described "rape trauma syndrome", testified as to general characteristics and matching characteristics in case at bar, and gave opinion whether victim was actually raped; court noted this type of testimony could be admissible in sexual assault of a child or a mentally retarded person). While certain courts would allow direct testimony that a child was assaulted based upon behavioral characteristics, *see State v. Geyman*, supra, still other cases stand for the proposition that expert testimony would be allowed only where the expert provides an opinion based upon objective criteria with which the victim's particular behavioral characteristics may then be compared. It is evidence going to demonstrate that a pattern recognized in other sexual abuse cases may exist in the case on trial. *State v. Kim*, supra. *See also U.S. v. St. Pierre*, 812 F.2d 417 (8th Cir.1987); *State v. Myers*, 359 N.W.2d 604 (Minn.1984).

Other courts would allow this type of expert testimony for witness rehabilitative purposes but not to directly qualify the veracity of a particular witness. *See, e.g., State v. Madison*, 53 Wash.App. 754, 770 P.2d 662 (1989); *State v. Black*, 537 A.2d 1154 (Me.1988); *Rodriquez v. State*, 741 P.2d 1200 (Alaska Ct.App.1987); *Wheat v. State*, 527 A.2d 269 (Del.1987); *State v. Myers*, 382 N.W.2d 91 (Iowa 1986); *State v. Moran*, 151 Ariz. 378, 728 P.2d 248 (1986); *Commonwealth v. Baldwin*, 348 Pa.Super. 368, 502 A.2d 253 (1985) [11]; *State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (1983).

---

**11.** The language in *Baldwin* has been further restricted. In *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986), *Baldwin's* prohibition on direct veracity testimony was expanded to include expert testimony that commented on the veracity of a class of potential witnesses of

It appears most courts have drawn the line where there has been direct testimony on the credibility of the victim. *See Thompson v. Alaska,* 769 P.2d 997 (Alaska App. 1989) (expert witness may not give a direct opinion on the truthfulness of a child); *Commonwealth v. Smith,* 389 Pa.Super. 626, 567 A.2d 1080 (1989) (expert's opinion testimony as to child's ability to 'in character' tell the truth prejudicial and counsel ineffective for failing to object to introduction); *People v. Gaffney,* 769 P.2d 1081 (Colo.1989) (witness may not offer opinion that child is very believable); *Tingle v. State,* 536 So.2d 202 (Fla.1988) (in rejecting expert's testimony on credibility the court writes, "[i]t was error for the state's witness to directly testify to the truthfulness of the victim"); *State v. J.C.E.,* 235 Mont. 264, 767 P.2d 309 (1988) (as a general rule, expert testimony evaluating the credibility of a witness is inadmissable, except when child is victim and testifies); *State v. Eldredge,* 773 P.2d 29 (Utah 1989) (no expert opinion on truthfulness of child). *But see State v. Geyman,* supra (testimony child was assaulted is admissible for purpose of helping jury assess credibility of child).

On close examination, it is fairly clear most courts do not approve expert testimony describing behavioral characteristics observed in sexually abused children as *substantive evidence* of abuse. *See, e.g., State v. Black,* supra. Confusion arises because some court decisions are less clear than others whether the evidence has been received as subjective evidence of abuse in that case, or is limited to testimony based upon objective facts, resulting in an opinion that the behavior exhibited by the victim was consistent with that generally displayed by victims of sexual assault. But it is also of apparent clarity such testimony is generally permitted to rehabilitate a child

victim's credibility. For example, in *State v. Moran,* supra, the Arizona Supreme Court approved the admission of expert testimony designed to rehabilitate a child witness, but held an expert should not state whether a child's behavior is consistent or inconsistent with sexual abuse. In *State v. Hudnall,* 293 S.C. 97, 359 S.E.2d 59 (1987), the South Carolina Supreme Court disapproved testimony that was solely designed to prove that abuse occurred. The court wrote:

> Courts that have admitted the type of syndrome evidence at issue here have typically allowed it only to explain a child-victim's post-trauma behavior as a common reaction to sexual abuse where it would otherwise appear impeaching, for instance if there is a retraction of the allegations or a delay reporting the abuse ...
>
> In this case, the evidence was admitted to bolster the child's testimony that the crime had in fact occurred and was not offered to explain any seemingly inconsistent response to the trauma. We find admission of this irrelevant and prejudicial expert testimony was error.

*Id* at 61–62.

A few decisions hold when expert testimony describing characteristic behavior in sexually abused children as a group is offered as direct evidence of the charged act, the party offering the evidence must establish the relevant scientific community accepts the basis for the opinion. *See, e.g., Anderson v. State,* 749 P.2d 369 (Alaska Ct.App.1988); *State v. Rimmasch,* 775 P.2d 388 (Utah 1989). Because of the relative newness of so-called "syndrome evidence",[12] acceptance may be difficult to prove but should be no less important as

---

which the victim was a member. This view was followed in *Commonwealth v. Emge,* 381 Pa.Super. 139, 553 A.2d 74 (1988), *Commonwealth v. Gibbons,* 383 Pa.Super. 297, 556 A.2d 915 (1989), and *Commonwealth v. Garcia,* 47 Cr.L. 1249 (Pa.Sup.Ct.1990). *See also Commonwealth v. Davis,* 518 Pa. 77, 541 A.2d 315 (1988).

**12.** Dr. Roland Summit published an article entitled "The Child Sexual Abuse Accommodation Syndrome" (CSAAS) in 1983. *See* Summit, *The Child Sexual Abuse Accommodation Syndrome,* 7 CHILD ABUSE & NEGLECT 177 (1983). Dr. Summit described five characteristics commonly observed in child victims: (1) secrecy, (2) helplessness, (3) entrapment and accommoda-

protection against unproven scientific principles. Where scientific value is proven, it must still be kept firmly in mind such evidence is not a "test" for abuse, *see People v. Bowker*, 203 Cal.App.3d 385, 249 Cal. Rptr. 886 (1988); *People v. Gray*, 187 Cal. App.3d 213, 231 Cal.Rptr. 658 (1987); rather, syndrome evidence assumes the presence of abuse, and explains the sexually abused child's reactions to it. *See People v. Sanchez*, 208 Cal.App.3d 721, 256 Cal. Rptr. 446 (1989); *In re Sarah M.*, 194 Cal. App.3d 585, 239 Cal.Rptr. 605 (1987). This is not to say that syndrome evidence is not of value in a criminal case. As one group of commentators has stated:

> The accommodation syndrome has a place in the courtroom. The syndrome helps explain why many sexually abused children recant allegations of abuse and deny that anything occurred. If use of the syndrome is confined to these rehabilitative functions, the confusion clears, and the accommodation syndrome serves a useful forensic function.

Meyers et al, *Expert Testimony in Child Sexual Abuse Litigation*, 68 NEB.L.REV. 1, 68 (1989).

The Court of Appeals in the instant cause recognized the array of caselaw supporting the admission of expert testimony in cases similar to the one at bar but decided the instant case on the basis of what was perceived to be applicable Texas law. The court also recognized the apparent absence of any conflict between the *Hopkins* case and Rule 702, but in a manner different from that we have discussed above. The appeals court focused upon the fear expressed by the *Hopkins* Court that the admission of psychiatric testimony may cause a trial to become a test of the credibility of both a defendant and of the various psychiatric witnesses, juxtaposing that

rationale with the requirement that testimony admissible under Rule 702 must either "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Deciding Brogden's testimony was the "equivalent of *passing* on the truthfulness of the complaining witness" (emphasis supplied), the court concluded the testimony was not admissible under Rule 702 because of the prohibition in *Hopkins*, supra.

It is axiomatic that a trial court is vested with the discretion to admit or exclude evidence and an appellate court should not reverse a trial court unless that court has abused its discretion in admitting the evidence at issue. *Marras v. State*, 741 S.W.2d 395 (Tex.Cr.App.1987); *Stone v. State*, 574 S.W.2d 85 (Tex.Cr.App.1978). The appellate court reviews the record with an eye toward the rules regarding relevancy and probative value of the proffered evidence, as well as any specific rule under which a particular piece of evidence or parcel of testimony is offered. As a basic premise, the evidence must be relevant to an issue in the case. Tex.R.Crim.Evid. 402.

> Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable.

*Plante v. State*, 692 S.W.2d 487 (Tex.Cr. App.1985), quoting from *Waldrop v. State*, 138 Tex.Cr.R. 166, 133 S.W.2d 969 (App. 1940).

 Relevant evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, delay, or unnecessary cumulative evidence, although we also recog-

---

tion, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction. The syndrome is not a diagnostic tool; one reasons from presence of sexual abuse to reactions to sexual abuse. The syndrome, elements of which are very similar to those enunciated by Dr. Brogden in the instant case, are therefore not probative

of the fact of abuse but may be probative to explain a child's seemingly contradictory conduct after abuse has allegedly occurred. Thus, accommodation syndrome must be distinguished from "Battered Child Syndrome", which is an accepted diagnostic tool in suspected child physical abuse cases.

nize most any evidence offered against a party will have some deleterious effect upon that party's case. *See* Tex.R.Crim. Evid. 403. And, in the case of expert testimony, the rules now clearly do not exclude such evidence merely because it encompasses or embraces an "ultimate issue" or fact in the case. *See* Tex.R.Crim.Evid. 704. Moreover, expert testimony by its very nature may tend to show another witness either is or is not telling the truth. That fact does not alone render such testimony inadmissible. The test is not whether opinion testimony embraces an ultimate fact in the case, for that is the expected or desired result of specialized testimony. The test, restated, is whether the expert's testimony, if believed, will assist the untrained layman trier of fact to understand the evidence or determine a fact in issue, Rule 702, supra, and whether it is otherwise admissible under general rules of relevant admissibility. To the extent the evidence is relevant to a matter or issue in the case, our evidentiary rules now require the party opposing the proffered evidence not only *demonstrate* the negative attributes of the evidence but also show how these negative attributes *substantially outweigh* the probative value of the evidence. As we recently noted in *Montgomery v. State* (No. 1090–88 and 1091–88, delivered May 30, 1990) (not yet reported), Texas evidentiary law has been significantly altered with respect to the admission of relevant probative evidence since the adoption of our new rules of evidence:

> Under the common—law rules, the proponent of a piece of evidence was required to show that the probative value of his offered evidence outweighed its prejudicial effect. See *Bush v. State*, 628 S.W.2d 441, 444–445 (Tex.Cr.App. 1982). See also *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Cr.App.1983). Under the new rules, however, there has been a shift in focus; now it is the opponent's burden to not only demonstrate the profferred evidence's negative attributes but to show also that these negative attributes *"substantially outweigh "* any

probative value. See *Crank v. State*, 761 S.W.2d 328, 342 n. 5 (Tex.Cr.App. 1988); *Rodda v. State*, 745 S.W.2d 415, 417–18 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd). See generally, Blakely, *Article IV; Relevancy and Its Limits*, 20 Hou.L.Rev. 151, 161 (1983); Goode, Wellborn & Sharlot, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL, Section 402.3 at 84 (1988).

At 910.

We cannot draw any bright line applicable in all cases, since expert testimony may take many forms and be appropriate in different circumstances. As a general proposition, however, we can be guided by the common sense language in Rule 702, as explained in *Pierce*, supra. Where specialized knowledge will assist the jury to understand the evidence or will assist them to determine a fact in issue, an expert may be allowed to provide the jury with the benefit of that knowledge. Two themes are prevalent within the language of the rule. First, the jury must not be qualified to intelligently and to the best possible degree determine the particular issue without benefit of the expert witness' specialized knowledge. *Pierce*, supra. Second, the clear meaning of the rule must be observed. Prior to adoption of the rules of evidence, this Court reaffirmed expert testimony is admissible to *aid* the jury in its decision, not to *supplant* that decision. *Holloway v. State*, 613 S.W.2d 497 (Tex.Cr.App.1981). We do not find Rule 702 broadens this predicate to admissibility. The reason behind the rule remains the same. The use of expert testimony must be limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror. The decision to be made remains with the jury, but the testimonial expertise is allowed to enable the trier of fact to better comprehend the full significance of the evidence. The evidence at issue is admissible if it encompasses or "embraces" an ultimate fact; it may not *decide* that fact for the jury.

We may best illustrate the distinction outlined above by utilizing the analogy found in *Rodriquez v. State,* supra. The Alaska Court of Appeals in that case held it was not an abuse of discretion for the trial court to admit the testimony of John Rabun, a social worker who had demonstrated expertise in the field of child sexual abuse. Rabun was allowed to testify as to general or background patterns found in exploited children and was further permitted to give his opinion whether the complainant's statements demonstrated a pattern consistent with Rabun's findings in his other investigations of exploited children. The court stated:

> It appears to us that there is a significant distinction between presenting a witness, such as a polygraph operator, to testify that a person is telling the truth, and presenting a witness who can state that the behavior of a witness falls within a common pattern.

\* \* \* \* \* \*

> Testimony by an expert witness that purports to establish by scientific principles that another witness is telling the truth treads on dangerous legal ground. On the other hand, testimony by an expert witness which provides useful background information to aid the jury in evaluating the testimony of another witness is admissible. We conclude that the testimony of John Rabun was this latter type of testimony.

*Rodriquez v. State,* 741 P.2d at 1204.

In terms of the rules, the first example impermissibly *decides* the issue for the jury; the second, while "embracing" that issue, merely offers background information to assist the jury in reaching its decision. *See also State v. Middleton,* supra, [expert testimony explaining superficially bizarre behavior of child who represses act by identifying its emotional antecedents in general population of many child victims could help jury better assess witness' credibility].

■ In the case at bar, witness Brogden's testimony consisted of statements which (1) provided the jury with information concerning the six elements or phases of what the Court of Appeals termed the so-called "Child Sexual Abuse Syndrome", and (2) applied those six elements to the facts of the case. There is no doubt the State indirectly bolstered the credibility of the complaining witness. Yet our review of the pertinent portions of the record discloses the prosecution, except for the one time noted *infra,* did not attempt to cross the line and have its expert give a direct opinion on the truthfulness of the child.[13] In an in-camera hearing prior to Brogden taking the stand before the jury, the trial judge was careful to define the parameters of permissible questioning, warning both witness and prosecution to stay within the abstract generalities of the elements or phases of intrafamily child sexual abuse and to apply those elements in abstract terms showing the behavior of the child was consistent with the elements. These instructions were followed. S— S— testified she had been sexually abused by appellant. Her testimony at trial differed from earlier statements. The defense was able

13. In *Kirkpatrick v. State,* 747 S.W.2d 833 (Tex. App.—Dallas 1987 pet. ref.), the appeals court reversed appellant's conviction on the grounds the expert witness' testimony was an improper direct and indirect comment on the complainant's credibility. We agree with that court's judgment as based upon the admission of testimony directly bolstering the victim's credibility, but not the court's disposition of points relating to that appellant's complaints regarding the effect of indirect bolstering. The court recognized the existence of Rule 704 which clearly allows an opinion on an ultimate issue, but harkened back to pre-rule authority stating experts should not be permitted to give an opinion on credibility because it "invades the province of the jury." As the concurring opinion in *Kirkpatrick* notes, *Hopkins* made clear an expert's testimony is not inadmissible solely for that reason. So, too, do we hold today an expert's testimony which in effect "matches" general or "classic" behavioral characteristics with a complainant's behavior patterns, but does not directly comment on the credibility of the victim, is admissible under Rules 702 and 704 as relevant and probative of the ultimate issue of guilt before the trier of fact.

to point out inconsistencies, changed testimony, denial or non-disclosure, and confusion on the part of the complainant to such a degree that a question would naturally arise as to the reason for her superficially bizarre or illogical behavior. Explaining this seeming illogical behavior by identifying its emotional antecedents could help the jury better assess the witness' credibility.[14] Given the information was of such specialized nature which is not normally within the common understanding of a lay jury, in that it was in the nature of explanation why S__ S__'s behavior was not of such bizarre or illogical nature under the circumstances as generally known in comparison with those characteristics of known abused children, and even though the problem may be one of increasing social awareness, we find it was of a type which could have assisted the trier of fact in determining the fact questions raised by the conflicting testimony of the complainant and her mother. *See and compare Dunnington v. State,* 740 S.W.2d 896 (Tex.App.—El Paso 1987 pet. ref'd) (expert testimony explaining possible reasons for delay in outcry and initial spousal denial not such complicated motivations or so foreign to the lay juror's experience as to necessitate expert explanation).

We recognize that sexual abuse of children is a problem in our culture.[15] Appellant does not deny behavior such as that exhibited by S__ S__ may exist following familial sexual abuse, or that the expert

**14.** This theory has supported admission of expert testimony on the "battered wife" or "battered women's syndrome" in some jurisdictions, including our own. *See Fielder v. State,* 756 S.W.2d 309 (Tex.Cr.App.1988) (expert testimony admissible under Art. 19.06, V.A.C.C.P. to rebut inference appellant's conduct in prior relationship was inconsistent with her claim of fear of husband; to extent expert could explain the endurance of the hypothetical women in a way that the jury could infer it is consistent with a claim of fear of abuser, that testimony was of "appreciable aid" to the trier of fact. Appellant established this was "subject ... upon which expert opinion would assist the jury.")

**15.** This problem is not a product of modern society. According to one commentator, there have been at least three efforts to study and respond to child sexual abuse before 1978, all of which were suppressed. In 1857, a French physician named Ambrose Tardieu published a book on rape entitled *A Medico–Legal Study of Assaults on Decency,* where he discussed thousands of cases of child sexual abuse. Tardieu also reviewed an 11–year period between 1858 to 1869, citing 11,576 cases of rape or attempted rape, of which nearly 80% involved young girls between the ages of four and twelve.

The second acknowledgment came in 1896 when Sigmund Freud presented a paper entitled *The Aetiology of Hysteria,* in which he defined his "seduction theory" by asserting that hysteria was etiologically related to childhood sexual assault. In response to peer pressure, Freud abandoned the theory in favor of his more well known theory "The Oedipus Complex", a complete reversal of his earlier theory where mental illness is explained in terms of children not being actually sexually abused, but fantasizing about sexual experiences. Freud's impact on the law was immediate, as evinced by John H.

Wigmore's influential treatise on evidence, first published in 1904, in which he warned that in sex offense cases, women and young girls were not to be believed absent "careful psychiatric scrutiny." Vestiges of Wigmore's influence may still be seen in evidentiary rules requiring corroboration of a sex victim's testimony, as compared to the admissibility of testimony of victims suffering other crimes.

In 1932 an associate of Freud, Sandor Ferenczi, presented his paper "The Sexual Passion of Adults and Their Influence on the Character and Development of Children." Although rejected by his colleagues, Ferenczi's insights would ring true for practitioners today. He wrote that the authority of adults can subordinate a young child to the wishes of the elder, changing the child into an unresisting automaton whose cries for help are often ignored or not taken seriously. He also foresaw that such treatment as a child could result in dissociative behavior as an adult.

The most recent acknowledgment of child sexual abuse began with corollary attention and reporting of physical abuse, beginning about 1962. With increased awareness of sexual abuse, researchers began to focus on such abuse. Unlike earlier attempts to illuminate the problem, this most recent reporting has a broad statistical base and through the late 1980s resulted in an increasing number of prosecutions under new child sexual abuse and assault laws. The commentator does warn, however, that the same prejudice which defeated earlier attempts to expose and control the problem are again facing society. *See* Meyers, *Protecting Children From Sexual Abuse: What Does the Future Hold?,* 15 J.Contemp.L. 31 (1989). *See also* Note, *Child Sexual Abuse Accommodation Syndrome: Curing the Effects of a Misdiagnosis in the Law of Evidence,* 25 Tulsa L.J. 143 (1989).

witness, whose credentials were not challenged, described it correctly. It is possible the jury would have been capable of deciding whether S__ S__'s behavior actually fit the pattern described by witness Brogden. However, we have no bright-line standard separating issues within the comprehension of the jurors from those that are not. When the evidence is of such content as to be classified as "specialized" within a particular discipline, a presumption may be drawn that the evidence is not of common experience. The admission of expert testimony is within the discretion of the trial court. Therefore, if a qualified expert offers to give testimony on whether the reaction of one child is similar to the reaction of most victims of familial child abuse, and if believed this would assist the jury in deciding whether an assault occurred, it may be admitted and the trial judge does not abuse his or her discretion in doing so unless the evidence otherwise fails to pass the test for admissibility.

The expert's testimony here encompassed at least one specialized view concerning the process through which a child may encounter and deal with an abusive situation. The record does not reflect the jury was of such composition that the knowledge was elementary or commonplace. What has been termed the dynamics of intrafamily child sexual abuse may now appear before the public in the form of newspaper articles, books and television programs, but such attempts to educate the public only underscores the foreignness of the subject to society in general and a lay jury in particular. We also hasten to add the State did not attempt to offer Brogden's testimony as anything other than what it was: one expert's opinion concerning S__ S__'s behavioral characteristics. While we may envision the future may require a defendant upon request to be given the same opportunity to place expert opinion before the jury, we reject the argument that such a practice will necessarily lead to a counter-productive "battle of experts" any more than what is now properly allowed under other contested conditions.

We now hold Brogden's testimony was of a type contemplated for proper admission under Rule 702.

■ Having decided Brogden's testimony was admissible under Rule 702, both in terms of his abstract or general testimony and his opinions applying the syndrome elements to the facts of the case, it remains to determine whether the testimony improperly bolstered the State's case. We do not weigh Brogden's abstract testimony identifying the six elements nor his explanation of each element or phase; it is the nature of admissible explanatory expert testimony to be of such specialized content as to be of great probative value. We look instead to the witness' testimony in the form of opinion going to the "ultimate issue" of the complainant's credibility vis-a-vis her conflicting statements to the authorities.

It is clear the import of Rule 702 and Rule 704 is to permit an expert opinion which "embraces" an ultimate issue, regardless of any incidental effect of bolstering the particular party's case. However, it should be remembered these specific rules must be read in conjunction with the general rules regarding relevance and probative value found in Article IV of the Rules of Evidence. *See* Rules 401 et seq and discussion *ante*. For example, although opinion evidence may not be objectionable under Rule 704 where it embraces an ultimate issue of fact, there is no proscription of an objection based upon the prejudicial content of the opinion. Thus, we do not find the standards regarding bolstering of a case or witness to have been expanded by passage of the rules. Instead, a court must weigh the effect of the bolstering in terms of probative value against the prejudicial effect of such evidence.

In the present case, the credibility of the complainant and her mother was directly brought into issue by the defense. It is clear from the record appellant's strategy was to transfer blame to another, at the

same time raising questions regarding the conflicting and contradictory testimony of the child. As discussed during the first part of this opinion, the defense was able to cast some doubt on the motive and credibility of the complainant and her mother. It was shown the child's version of events and circumstances surrounding the incident had changed from the day she was videotaped to the day of trial. On the witness stand, she was both confused and reticent in answering questions, especially during her cross-examination by an able defense counsel. Counsel brought out inconsistencies not only in the child's statements, but also in her mother's testimony as compared with that of S___ S___ and Dr. Casanova. Finally, there is the fact that S___ S___, when given the opportunity to tell the doctor of the abusive acts, remained silent.

■ It is a well settled rule in this State the prosecution may not bolster or support its own witnesses unless they have been impeached on cross-examination. *Farris v. State*, 643 S.W.2d 694 (Tex.Cr.App.1982); *Pless v. State*, 576 S.W.2d 83 (Tex.Cr.App. 1978). An unimpeached witness may not be bolstered simply because his or her testimony may be disbelieved; it is only when a witness is placed in a position of having testified differently from earlier testimony that a party will be permitted to bolster its own case. *Adams v. State*, 514 S.W.2d 262 (Tex.Cr.App.1974). *See also Lyons v. State*, 388 S.W.2d 950 (Tex.Cr.App.1965). The bolstering testimony must be related to the impeachment to be admissible. *See O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr. App.1979). As we stated in *Farris*, supra, "The rehabilitating facts must meet a particular method of impeachment with rela-

tive directness. The wall, attacked at one point, may not be fortified at another and distinct point." *Id.*, citing C. McCormick, McCormick on Evidence, Sec. 49 (2nd Ed. 1972). *Now see* E. Cleary, et al; McCormick on Evidence, Sec. 49 at 116 (3rd Ed. 1984). In terms of the Rules of Evidence, the probative value of such evidence is enhanced and the prejudicial effect diluted, given the circumstance of impeachment and the fact that the bolstering testimony directly fortifies the breached wall.

It is apparent from reading the Court of Appeals' opinion that its decision in the instant case was based upon the results found in *Hopkins* and *Farris*, both supra. Both cases are distinguishable on the facts. In *Hopkins*, supra, we decided the particular testimony was not of specialized nature to fit within the pre-rules standard. In *Farris*, supra, another pre-rules case, while the testimony may have been of a specialized nature and otherwise admissible[16], we held the evidence to be inadmissible as improper bolstering:

> The State does not point in its brief, nor did it point at trial, to any impeachment of the child witnesses or any vigorous cross-examination which tended to undermine their testimony. *Smith v. State*, 595 S.W.2d 120 (Tex.Cr.App.1980).

> Our examination of the record reveals two or three instances of attempted impeachment or impeachment of the child witnesses. Such instances were not on material matters and were totally unrelated to the bolstering testimony of Dr. Grigson.

 \* \* \* \* \* \*

We are unable to hold that the improper testimony of Dr. Grigson was harmless.

---

**16.** The testimony at issue in *Farris* came from Dr. James P. Grigson, a frequent witness for the State in capital prosecutions. Grigson testified children are incapable of fantasizing concerning the kinds of acts the defendants in that case were accused of committing. We did not decide whether his testimony would have been otherwise admissible, and decline to take a second bite of the apple now. It is apparent, however, that such a fixed or inflexible opinion seemingly incapable of contradiction and coming as it does from a medical expert, may well cross over the line between *assistance* to the trier of fact and *deciding* an ultimate issue for that body. The better practice would be to phrase the question and response in terms of whether a child will usually or normally conduct him or herself in such a manner, or whether the particular child's actions are consistent with that of other children who have been shown to have been abused.

It would be unreasonable not to conclude that the testimony of the small children was bolstered immeasurably by testimony that they were utterly incapable of fantasizing about deviate sexual intercourse.

*Farris,* 643 S.W.2d at 697.

Here, the State did not call Brogden to the stand until after the complainant had been cross-examined and effectively impeached. *Cf. Miller v. State,* 757 S.W.2d 880 (Tex.App.–Dallas 1988, pet. ref'd) (State bolstered own case during direct examination of first witness who had not been impeached). Contrary to the situation in *Farris,* supra, the State in its instant brief has pointed out both to this Court and to the court below specific instances in which the child complainant was effectively impeached by vigorous cross-examination by the defense. Much of the impeachment evidence had to do with S___ S___'s change in testimony concerning the events of the alleged offense. The defense tried to emphasize her apparent confusion by utilizing the theory Patsy or someone else was guilty of the offense, if one had indeed occurred, and Patsy and others had programmed the child to tell a certain story which she had trouble remembering. The defense rationale was exploited throughout final arguments:

This girl is confused. I don't think she knows exactly—well, I'm going to say this. I think S___ believes everything she said up here in the witness stand. I think she believes that in her heart. I believe she's conditioned herself, she's been over it so many times with them, I think she believes it. I don't think she intentionally misled you one bit.

I think you could say from a meaningful standpoint S___ was trying to tell the truth. I think they have gone over it with her so many times that it's become a reality to her on this thing. I don't think she tried to mislead you, but look at the pressure that's been on this child.

\* \* \* \* \* \*

Another little inconsistency threw in, I don't know whether it is nit-picking or whatever you want to call it. The story's now come down and he's going to burn me with cigarettes and cut me with knives. Started out, he was going to ring my neck.

\* \* \* \* \* \*

That's what she told the police. That's what she told Jackie Smith.

How much can the story change? It's gone so far, ladies and gentlemen, in two years they have completely undressed. They had their clothes on back then, September 1984. They have gotten naked now. Completely naked on the floor. They started out on the toilet.

\* \* \* \* \* \*

S___, like I told you, there's numerous inconsistencies, I won't go over them all. Like I said, I don't think she tried. I think she's been over this story so many times and they have got her primed on it so well that she's up here—she's acting. In fact, I walked out in the hall when she went to take a break and she says 'Did I do good?'

The material matters or issues upon which the complainant was impeached were directly related to witness Brogden's testimony. For that reason, we hold the trial court did not abuse its discretion in admitting the expert witness' rehabilitative testimony over a defense objection of bolstering. The Court of Appeals incorrectly focused upon the indirect result of the testimony—bolstering of the complainant's credibility—without reference to the context in which the testimony was allowed. As stated *infra,* the fact that an expert witness' testimony may have the indirect result of bolstering another witness' credibility is not the test for admission under Rule 702 but may be relevant to determination of admissibility under the general rules of relevancy and probative value of evidence. *See* Rule 402 and 403, both supra. Here, although Brogden's testimony

did have the effect of bolstering the child's testimony, such testimony would, if otherwise proper, be admissible to rebut the impeachment of a child in the majority of jurisdictions passing on the question.

■ In conclusion, we have today held the trial court properly admitted Brogden's testimony under Rule 702. The content of the knowledge at issue concerns various so called elements or phases of what may be termed "Child Sexual Abuse Syndrome". Brogden was shown to be an expert in the field of child sexual abuse, having worked or supervised some twelve to fifteen hundred cases and observed hundreds of children testify. Although he did not personally examine the complainant, he was present in the courtroom and heard the testimony of the principal witnesses.[17] The defense having effectively impeached the complainant's credibility as a witness, the State was allowed, if otherwise admissible, to solicit the expert information and opinion of Brogden to help the jury understand why S— S— changed her testimony or appeared confused. In this regard, Brogden provided information on a topic not of general knowledge to the average layperson. Child abuse, especially of the sexual kind, is not a new problem to society. We have learned, much to our dismay, the problem is larger than ever thought, largely because child sexual abuse was in the past a hidden crime—a taboo topic of conversation. But it cannot be said that each of us *understands* all facets of the problem, including why a child who has been abused will act in a certain manner which to the layman may appear unreasonable or inconsistent with a claim of abuse. Brogden's information was both relevant and admissible under the rules of evidence, because it was specialized information of value in assisting the jury to understand the evidence regarding the complainant's conduct.

Brogden's testimony applying the abstract elements to the instant case present a closer question. It is undeniable this aspect of his testimony indirectly embraced the question of the complainant's credibility. Under our interpretation of the rules, such testimony which merely *embraces* an ultimate issue is clearly admissible under Rule 704. The situation would be different if the trial court had permitted Brogden to give an opinion whether he believed S— S— was telling the truth or could be believed. The latter form of opinion would not only embrace the ultimate issue of whether the child was abused as charged, it would cross the line of *assisting* the trier of fact to *replace* that body as decision maker. We note again the opinion testimony was of a background and rehabilitative nature, admitted only after some doubt had been cast on the State's theory of prosecution by defense counsel. Since the testimony here did not cross that line in an attempt to decide the issue for the jury and was in the nature of background rehabilitative evidence, the trial judge did not abuse his discretion in admitting the testimony. *See Rodriquez v. State*, supra; *State v. Middleton*, supra; *State v. Kim*, supra.

The State's ground for review is sustained.[18] The judgment of the Court of Appeals is reversed and the cause is remanded to that court for review of appellant's remaining points of error.

CLINTON, BERCHELMANN and STURNS, JJ., concur in the result.

17. Rule 703 provides that the facts or information upon which an expert witness bases an opinion or inference includes that which he or she perceives or is made known to the expert at or before the hearing. The rule foresees the witness' presence in the courtroom and does not prohibit his testimony simply because he did not examine the particular person at issue. Examination, or lack thereof, would go to the weight of the testimony, not its admissibility.

18. We also agree, for the reasons stated in the opinion, that the Court of Appeals incorrectly based its decision on the alternate theory infer-

ring the procedure by which Brogden observed the witnesses testify and was given access to the police report and videotape was improper. As pointed out *ante,* Rule 703 envisions such a procedure. Indeed, in order to keep expert testimony from *deciding* rather than *embracing* an ultimate issue concerning a particular witness, it would appear the better practice not to have a non-diagnostic expert personally examine an alleged child abuse victim, lest *his testimony become tainted* by personal reference to the credibility of the child victim's claims.

TEAGUE, Judge, dissenting.

I agree with the holding by the Second Court of Appeals, see its cause of *Duckett v. State*, numbered 2–86–217–CR, and opinion in that cause dated February 17, 1988, that the expert testimony that was given in this cause is the equivalent of a witness passing judgment on the truthfulness of the complaining witness. Because the majority opinion is in conflict with this holding, I respectfully dissent.

In *Hopkins*, 480 S.W.2d 212 (Tex.Cr.App. 1972), henceforth *Hopkins*, this Court stated the following: "Our principle fear is that the admission of psychiatric testimony will often cause the trial to become not only a trial of the defendant, but also a trial of the witness." I find that the majority opinion aggravates that concern.

In *Hopkins*, this Court refused to allow expert psychiatric testimony to be used in determining the credibility of a witness. There being no conflict between *Hopkins*, and subsequently enacted Tex.R.Crim. Evid., Rule 702,[1] I see no reason to depart from the established rule laid down in *Hopkins* and begin down a road that will allow any "snake oil salesman" disguised as an "expert" witness to peddle his wares in the trial courts of this State, which is what I believe the majority opinion approves of doing. However, see and compare what I stated in the dissenting opinion that I filed in *Werner v. State*, 711 S.W.2d 639 (Tex. Cr.App.1986). Also see the reasons I gave why I joined the majority opinion of *Fielder v. State*, 756 S.W.2d 309 (Tex.Cr.App. 1988).

The issue before us concerns the testimony of John Brogden, an investigator and social worker employed by the Texas Department of Human Services. Brogden is not a psychiatrist or psychologist. Nevertheless, even though a mere social worker, Brogden professed to being knowledgeable enough to be an "expert" in a topic which is not without controversy among health care professionals. See Note, "The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims," 74 *The Georgetown Law Journal* 429, (1985).[2]

The facts of this cause show that there were no independent eye witnesses to the sexual abuse allegedly inflicted upon the complainant by appellant. A Dr. Robert Casanova testified that the complainant showed no physical signs of sexual abuse.

Thus, Brogden's testimony was crucial to the State's case. I believe that to fully understand the harmfulness of Brogden's testimony, excerpts of his testimony should be highlighted. Brogden's testimony was loosely divided into three phases.

*In the first phase*, Brogden testified in general terms about something he labeled as "elements" typically found in child sexual abuse cases. He identified six elements: (1) Access and opportunity: "Where the defendant has the literal abilty to be alone with the child"; (2) Sexual engagement: "Where multiple events of a sexual nature occur"; (3) Conditioning aspects: "Where the offender literally conditions the child to accept the sexual overtures and advances"; (4) Repression: "Forgetting or becoming aggaravated with their dilemma"; (5) Disclosure: "Where the child accidently or purposely discloses the abuse to an adult"; and (6) Suppression-repression: "Where the offender tries to suppress the child's statement, repression being a psychological defense against upsetting information to the child, where the events are often altered or forgotten."

---

**1.** Rule 702 provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

**2.** In one leading case on expert testimony, the Ninth Circuit remarked that "expert testimony particularly courts a substantial danger of unfair prejudice" because of its "aura of special reliability and trustworthiness." See *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973).

This Court's majority opinion accepts the broad assertion that Brogden testified to "Child Sexual Abuse Syndrome." However, nowhere in Brogden's testimony does he make any reference to this so-called syndrome. The majority opinion further misleads the reader when it refers to Dr. Roland Summit's article describing what he characterizes as "Sexual Abuse Accommodation Syndrome."[3] However, in this cause "Sexual Abuse Accommodation Syndrome" was never mentioned by anyone in the trial testimony. Upon close inspection, one can see that there is a large difference between Dr. Summit's characteristics and Brogden's elements. After testifying in general terms to these "elements," Brogden then continued into the second phase.

*In the second phase*, Brogden tied his "elements" to the facts of this cause by going through each element and telling the jury he, not surprisingly, saw signs of each element in the complainant's testimony.[4]

The record reflects the following which occurred during the State's case-in-chief and over appellant's objection:

Q. (Prosecutor): Do you find any of these elements present in this case?

．　　．　　．　　．　　．

A. (Brogden): Yes, I find every element present in this case.

．　　．　　．　　．　　．

Q. Do sometimes children indirectly ·report child abuse?

A. Yes, typically

．　　．　　．　　．　　．

Q. Okay, and sometimes do they try to report or to attempt to report sexual abuse through complaining of physical ailments that do not in fact exist?

A. Yes, specially tied to the genitalia.

There is testimony in the record that reflects that the complaining witness' first complaints were of vaginal itching and not sexual abuse. The record also reflects the following:

Q. (Prosecutor): And have you seen some manifestation of that in this case?

．　　．　　．　　．　　．

A. (Brogden): Yes, I have seen that in this case.

．　　．　　．　　．　　．

Q. Do you find evidence of access and opportunity in this case?

．　　．　　．　　．　　．

A. Yes.

Q. Would you please tell the jury what evidence of that you find in this case?

A. The offender being alone in the home with the child at a time when the mother was away at the hospital; the child was alone in the bathroom and the offender came into the bathroom.

(Objection by defense counsel: "Your Honor, were going to object to this.

**3.** Dr. Summit described in his article five characteristics commonly observed in child abuse victims: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, and unconvincing disclosure, and (5) retraction. Summit's article makes it clear that he intended the accommodation syndrome be used as a "common language" between health care professionals working with sexually abused children. Summit did not intend the accommodation syndrome as a diagnostic device. The syndrome does not detect sexual abuse. Rather, it assumes the presence of abuse, and attempts to explain a child's reaction to it. *People v. Bowker*, 203 Cal.App.3d 385, 249 Cal.Rptr. 886 (1988). Also see page 11, *post.* "Child sexual abuse

accommodation syndrome" is not the sexual abuse analogue of battered child syndrome, which is diagnostic of physical abuse. Also see Myers, "Expert Testimony in Child Sexual Abuse Litigation, 68 *Nebraska Law Review* 67 (1989); Summit, "The Child Sexual Abuse Accommodation Syndrome", and 7 *CHILD ABUSE & NEGLECT* 177 (1983).

**4.** Several decisions have held that an expert may not describe a particular child because avoiding discussion of a particular child is less likely to confuse the jury. See e.g. *People v. Gray*, 187 Cal.App.3d 213, 231 Cal.Rptr. 658 (1986); *People v. Roscoe*, 168 Cal.App.3d 1093, 215 Cal.Rptr. 45 (1985).

He's assuming these facts are true. Is—and making—making a statement as to the credibility of whether they are true or not true, we haven't even had a chance to rebut these whatsoever."

The Court: I'll overrule the objection.)

The above is just one example where Brogden in effect testified to the truthfulness of the complainant's allegations.

I believe that it is important to keep in mind two significant facts:

(1) Brogden, the State's "expert" witness, was exempt from "the rule"; consequently, he was allowed to listen to the complainant's testimony, who testified immediately before he did.

(2) On cross examination, appellant was able to elicit inconsistencies in the complainant's testimony, but what remained consistent is the identity of appellant and the location where the alleged incident took place.

Another example of a direct comment by Brogden on the truthfulness of the complainant is shown by the following excerpt from the record.

Q. (Prosecutor): Now in the case of a young child ... of four years old and who is giving the story of what may have occured during a sexual assault over the course of two years and is consistent on the ... identity of the offender and the sex acts that occured, are they generally pretty consistent about that?

. . . . .

A. (Brogden): Young children with time lapses of two to three years, post-investigations, typically have some lapses in memories. Typically, they repress certain portions of the sexual abuse and the story isn't exactly the same as it was but the major portions of the story are the same, the major portions being the identity of the offender, location of the crime, and the major traumatic imprint behavior being those things that seem to bother them. Other things that seem to bother them that are too confusing are repressed and treatment is necessary.

Brogden then continued this type of testimony running through each of the elements and stating how each was represented by the evidence in this case.

Q. (Prosecutor): Did you find some indication of that [sexual engagement] in this case?

A. (Brogden): Yes.

. . . . .

Q. And what would that be?

A. Specifically intriguing in this particular case is what you find with many young children is what is typically called dry intercourse where the offender is not, in fact, attempting penetration; the offender is basically trying to masturbate by rubbing himself upon the child's genitalia. ...

The majority opinion has justified allowing a jury to hear the above type of "expert" testimony, not as substantive proof that the offense occured, but to rehabilitate the impeached child complainant. I must ask: Given the record, what possible rehabilitative function could the above "expert" testimony serve?

Testimony of a young child witness is easily and often impeached because of a young child's tendencies to give inconsistent statements. See Myers, supra. Based upon the appellant's cross-examination of the complainant, which produced no unusual inconsistencies, the majority opinion states: "It is fairly clear that most courts do not approve expert testimony describing behavioral characteristics observed in sexually abused children as substantive evidence of abuse." However, it is common knowledge that anytime that you have a young child witness simple cross-examination will disclose some inconsistencies in the child's testimony. This leaves the defendant the dubious decision of either not

924

cross examining the child witness or cross examining the child witness, thereby allowing the State to pull its "expert" out of the hat to testify that each inconsistency the child gave is typical of a sexually abused child. The majority opinion concludes: "The defense having effectively impeached the complainant's credibility as a witness, the state was allowed, if otherwise admissible, to solicit the expert information and opinion of Brogden *to help the jury understand why S— S— changed her testimony or appeared confused."* (Emphasis supplied.) Brogden's testimony, however, did nothing to help the jury understand the complainant's testimony. Rather, its effect was twofold; (1), to assert that the complainant testified truthfully and (2), its use as substantive evidence that the act occured. The rehabilitating facts must meet a particular method of impeachment with relative directness. The wall, attacked at one point, may not be fortified at another and distinct point. See C. McCormick, *McCormick on Evidence,* at 103 (2nd. Ed. 1972).

In *Hall v. Arkansas,* 15 Ark.App. 309, 692 S.W.2d 769 (1985), the Arkansas Supreme Court found that an expert's testimony on the dynamics of child sexual abuse was prejudicial enough to justify reversal of the defendant's conviction. In *Hall,* the defendant allegedly sexually abused three young children while baby-sitting them. A psychologist with training in dealing with sexually abused children testified to typical reactions in sexually abused children. The "expert" testified that most child abusers are known to the family and the abuser warns their victims not to tell anyone what had happened to them. The "expert" also testified that children lack the vocabulary to discuss what happened. The court pointed out that much of the "expert's" testimony was tailored to fit the facts of that particular case. The court also found that some of the "expert's" testimony could be of help to a jury, i.e.,

the difficulty children have in putting their experience into words. Nevertheless, the court concluded that "this type of evidence was *not* of proper benefit to the jury in this case," and that it was "distractfull[sic] and prejudicial." (Emphasis supplied.) The court also stated that it was troubled by the fact that the "expert" testimony was not introduced in order to rebut "misconceptions about the presumed behavior of the victim but to prove ... that the circumstances and details in this case match the circumstances and details usually found in child abuse cases." I find that the "expert" testimony in this cause has the same effect; Brogden's testimony did nothing to help the jury understand the statements of the complainant, nor was it really offered to do so.

*The third phase of Brogden's testimony* consisted of the State going through each inconsistency in the complainant's testimony.[5] I find that there is something fundamentally strange about saying that since the story is inconsistent, it must be true.

The record in this cause reflects the following:

Q. (Prosecutor): Would some of that repression be differences between what you observed on the tape and what you observed [the child] testify [to] ...

A. (Brogden): Yes.

Q. ... to here in court.

A. Yes. Be those major differences.

Q. Okay. Do you find any of those differences in light of what you observed to be not usual[typical] for a child sexual abuse victim?

A. No,.... typical

Q. They were typical?

A. Yes.

Q. Okay. Do you recall Mr. Eakman asking the question of S— S— as to

5. In *Commonwealth v. Gibbons,* 383 Pa.Super. 297, 556 A.2d 915 (1989), the court held it was error to admit expert testimony regarding in-

consistency even though the defendant based his case on inconsistency.

whether or not on the tape she said [she was sexually abused] six or seven times?

A. Yes.

The record also reflects that the complainant testified in court that the sexual abuse occured only once.

Q. (Prosecutor): Is that consistent with the repression that you described earlier?

A. (Brogden): Yes, it is.

. . . . .

Q. Okay. Do you recall Mr. Eakman asking S— S— the question whether anything came out of the defendant's penis?

A. Yes.

Q. Okay, and you recall S— S— answered that question, she did not recall anything coming out of his penis?

A. Yes.

Q. That's inconsistent with what she said about ejaculation on the tape?

A. Right. It is different than what she said on the tape.

Q. Okay. Do you find the [above] inconsistency to be typical of repression?

A. Certainly. Typical of repression, yes.

It is obvious to me that Brogden is simply testifying that all the inconsistencies in the child's story are typical of a sexually abused child, as he personally perceives such.

Part of appellant's defense was that he did not sexually abuse the child; rather, according to appellant it was another relative, a female, who sexually abused the child. Brogden testified that "males typically represent 95 to 98 percent" of the child sexual offenders. This in effect is the equivalent of having an expert testify that the defendant's theory had a 98% chance of being *false.*

6. Rule 403 provides: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of un-

The El Paso Court of Appeals interpreted Rule 702, see fn. 2, *ante,* in *Garcia v. State,* 712 S.W.2d 249 (Tex.App.–El Paso 1986, P.D.R. Refused). There the State introduced evidence in the form of testimony of a psychologist to the effect that the complaining witnesses were telling the truth. The court of appeals found that the determination of the credibility of a witness is the sole responsibility of the trier of fact and that the attacks on credibility are best made by rigorous cross-examination. The court gave its interpretation of Criminal Rule 702 as follows: "We do not believe the purpose behind this rule is to permit 'expert' opinion on who is telling the truth and who is not." I agree.

In a long line of opinions from various courts of appeals of this state, the rule laid down in *Hopkins,* prohibiting expert testimony that directly or indirectly expresses an opinion on the credibility of a witness, has been consistently applied. See, for example, *Dunnington v. State,* 740 S.W.2d 899 (Tex.App.–El Paso 1987, P.D.R. Refused), henceforth *Dunnington,* where that court held that the probative value of rebuttal testimony of a purported expert in the field of child sexual abuse was outweighed by its potential for prejudice in invading the province of jury. Also see Tex.R.Crim.Evid., Rule 403.[6] In *Dunnington,* the expert testified to the conditioning process to which offenders subject their child victims and reasons for "spousal denial". The court stated:

"All the aforementioned explanations may be perfectly true. They may have been focused upon by experts in their research. Some effort may have been made to quantify ... these factors. Certainly they have titles such as 'spousal denial' and conditioning process. None of this, however, converts the commonplace into the extraordinary. Expert testimony is not justified by the expert's need to publish his work or the prosecu-

fair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay....

tor's need to preclude the jury from making up its own mind. It is justified when it enhances the jury fact-finding process instead of abrogating it."

See also *Thomas v. State*, 748 S.W.2d 539 (Tex.App.–Houston [1st] 1988); *Burke v. State*, 642 S.W.2d 197 (Tex.App.–Houston [14th] 1982); *Welch v. State*, 677 S.W.2d 562 (Tex.App.–Eastland 1984); and *Kirkpatrick v. State*, 747 S.W.2d 833 (Tex. App.–Dallas 1987).

In *Farris v. State*, 643 S.W.2d 694, 697 (Tex.Cr.App.1982), this court held that it was reversible error to allow a psychiatrist to testify that a six year old was incapable of fantasizing about the sado-masochistic acts the defendants, who were accused of committing child sexual abuse, allegedly engaged in. This court reasoned that the child's testimony was impermissibly bolstered because of the lack of any rigorous cross-examination or impeachment that tended to undermine the child's testimony.

The issue before us in this cause has been before the highest courts of other states, but seldom is it presented in the same context as occurred in this cause. Differences from state to state, with regard to the scope of review and evidentiary requirements, make it most difficult to give an intelligent tally.[7]

Some states have held that expert testimony cannot be used to show that a child is telling the truth or that a child accurately testified. See, for example, *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990), (Held, proper to refuse defendant's proffer of expert testimony that child complainant was susceptible to suggestion and influence from family members); *Wheat v. State*, 527 A.2d 269 (Del.Superior Ct.1987) (Held, expert testimony in child sexual abuse case which provided a statistical evaluation of complainant's present veracity following a recantation impermissibly invaded credibility province of trier of fact in "lie detector" fashion and required reversal).

The Tennessee Court of Criminal Appeals discussed the issue in a thorough manner in *State v. Schimpf*, 782 S.W.2d 186 (Tenn.Cr.App.1989), henceforth *Schimpf*. There, the defendant allegedly sexually abused a five year old in three separate incidents. The state offered the testimony of a Dr. Abraham Brietstein, who claimed to be an expert in the evaluation and treatment of sexually-abused children. Brietstein testified to "Child Sexual Abuse Syndrome," or, in his words, "I make some kind of determination using what I refer to as differentiating criteria" as certain "signs and symptoms and characteristics that are typical of children who have been sexually abused."

From what was accurately stated in *Schimpf*, I believe that one can infer that there is no recognized "Child Sexual Abuse Syndrome" that contains consistent elements. Rather, the syndrome is whatever the particular expert wants it to be, based upon elements he himself has created or manufactured, or has plagarized from other's works.

In *Schimpf*, Brietstein identified, not six elements as Brogden did, but rather twelve elements[8] The court stated:

"We think that Dr. Brietstein's testimony clearly confirmed that [the child] had, in fact, been sexually abused. Our only difficulty with this is that he confirmed it for a jury deciding defendant's guilt or innocence rather than for a psychologist deciding how to treat a victim.

---

7. The Oregon Supreme Court held that if the state offered evidence of a syndrome to rehabilitate a child's credibility, the syndrome should be subjected to the Frye test, see *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), for the admissibility of novel scientific evidence. Also see *State v. Milbradt*, 305 Or. 621, 756 P.2d 620 (1988).

8. These are as follows: (1) Consistency; (2) Details; (3) Language; (4) Corroboration; (5) Secrecy; (6) Multiple Incidents: children are more likely to have been actually sexually abused if the contact reportedly occured on more than one occasion; (7) Trauma Level; (8) Show And Tell; (9) Anger (10) Suggestibility; (11) Motive; and (12) Expert's Conclusion.

We find that Dr. Brietstein's testimony invaded the jury's province by offering testimony which went to credibility. Credibility of a witness is a matter only for the jury ... The jury had no need for his testimony. We daily submit to juries the question of whether unlawful sexual activity has occurred. They routinely return verdicts without the assistance of expert testimony. Crouched in scientific terms as it was, it could only have confused and misled them ... Its admission was error."

In *Commonwealth v. Smith*, 389 Pa.Super. 626, 567 A.2d 1080, 1083 (1989), henceforth *Smith*, that court held that an attorney's representation was ineffective because he failed to object to testimony of a therapist that a seven-year-old alleged victim of child sexual abuse was, in the opinion of the therapist, telling the truth. The facts reflect that the therapist testified, without objection, that in her opinion the child victim was believable because the case contained characteristics that she had concluded were commonly observed in sexually abused children. Basically, the therapist testified that, according to her "characteristics," the child's story was believable. The therapist also explicitly compared the general behavioral characteristics of sexually abused children to the specific behavioral characteristics of the complainant. The court found that the expert testified to the child's character for telling the truth, and held that by doing so he "usurped the credibility determining function of the jury" and that this infringement upon the "jury's sacred domain" harmed the defendant because the victim was the linchpin of the state's case. The court further stated: "We find it unwise to create an exception to the credibility-determining function of the jury in a case in which an alleged child/victim testifies." The court also held that the jury, taking into consideration the youth of the witness, can make the determination as to the veracity of the testimony and credibility of the witness, without the

assistance of expert testimony. The court appears to have been offended that a witness who holds herself out as an expert can take the stand and, under the guise of "rehabilitation", testify as to the credibility of the complainant. The court stated the following: "To allow such testimony is to permit the unlawful usurpation of the credibility-finding function of the jury. This strikes at the heart of our system of justice."

In *Smith*, the Pennsylvania Court further noted that the problem was magnified because the witness was called as an "expert" witness for the state. The Court emphasized that an "expert" will have much more influence on a jury and its members who have had little or no contact with sexually abused children, which I believe is usually the case.

In *State v. Black*, 537 A.2d 1154 (Me. 1988), a case involving the sexual abuse of a child, a state's expert witness described certain factors frequently encountered in sexually abused children. The expert then testified she saw these factors present in the alleged child victim, which was obviously an attempt to prove that the child had been sexually abused. The defense objected to the testimony on the ground that there had not been evidence of acceptance in the scientific community on the issue.[9] The court held that in the absence of any showing of scientific reliability, the evidence was improperly admitted. It stated: "Whether described in terms of 'indicators,' 'syndromes,' 'patterns,' or 'clinical features' the objective of such evidence is to establish on the basis of present conduct that in the past someone has been subjected to a specific trauma. We conclude that the present record fails to demonstrate the scientific reliability of such evidence." (p. 1157).

I find that at the present time there are too many "syndromes" and no consensus in the mental health community as to what they actually mean or are meant to mean.

9. See fn. 7, *ante.*

For a listing of many types of "syndromes," see *Werner v. State*, 711 S.W.2d 639, 649 (Tex.Cr.App.1986) (Teague, J., dissenting opinion).[10]

In reference to the "child sexual abuse" syndrome, some of the commonly observed reactions in children who were allegedly sexually abused are anxiety, regression, sleep disturbance, acting out, depression, and nightmares, to name just a few. However, these behaviors are also associated with a wide range of psychological problems that have nothing to do with sexual abuse. "The fact that a child suffers nightmares, regression, and depression says little about sexual abuse. A myriad of other circumstances cause such behaviors." Myers, supra.

From the above, I have concluded that any benefit to be gained by admitting expert testimony on such speculative psychiatric theories as "Child Sexual Abuse Syndrome" is substantially outweighed by the prejudicial effect it will have on a jury.

Before closing, I must point out that the implications of the majority's opinion are far reaching and raise many interesting questions, such as the following: Is it now permissible for an "expert" witness to testify that it is typical behavior for a witness, defendant, or victim to tell the truth, and then change their story or totally recant? Can the State now offer "expert" testimony that it is typical for a key state's witness in an organized crime trial to often recant and change his story? Will the defendant now be permitted to put his "expert" on the stand to testify that the child complainant does *not*, according to his "test," show elements typically found in sexually abused children? May the defendant now offer "expert" testimony that there is no generally accepted syndrome in the mental health community and that the State's "expert" witness is being untruthful if he testifies there is? Is the defendant entitled to call his "expert" witness to testify to the suggestiveness of children and their desire to testify as authority figures tell them to? Must the alleged child victim be forced to listen to the "expert" witnesses? If so, what kind of adverse effect will these dueling expert witnesses have on the child? Moreover, may the defendant in a "pedophile" case now offer "expert" testimony that he or she does not exhibit certain characteristics common to pedophiles? See *People v. Ruiz*, 222 Cal. App.3d 1241, 272 Cal.Rptr. 368 (1990) (Held, a child sex-abuse defendant was improperly barred from putting an expert on the stand to testify that defendant did not fit the typical pattern of a pedophile). Should an "expert" now be permitted to testify at the punishment phase that the defendant is worthy of probation? Cf. *Gonzales v. State*, 756 S.W.2d 413 (Tex. App.–El Paso 1988, no P.D.R.).

If the type "expert" testimony that the majority opinion holds in this cause is admissible, then surely "expert" testimony offered by any defendant as to the unreliability of eyewitness testimony is now admissible. Cf. *Welch v. State*, 677 S.W.2d 562 (Tex.App.Eastland 1984, P.D.R. Refused,) (Held, exclusion of psychologist's testimony as to the unreliability of eyewitness testimony not error). Thus, after today's majority opinion, it should follow that "expert" testimony that relates to the suggestiveness of a defendant's in-court or out-of-court identification is now admissible

---

10. In *State v. Saldana*, 324 N.W.2d 227, 229 (Minn.1982), that court stated, in reference to the "rape trauma syndrome," that "these symptoms may at least be reliable indicators that some psychologically traumatic event has occurred, although they do not necessarily indicate that the event was rape." The Court held that evidence in rape trauma cases is often used to rebut the defendant's claim that the complainant consented. In these cases there will be no dispute that sexual intercourse occurred, only a question of the underlying nature of the act.

"Sexual abuse, on the other hand, can be a traumatic attack or can continue for years without use of force at all. The symptoms as described to the courts do not reliably indicate anything more than some unfocused behavioral or emotional problems. Unlike rape trauma syndrome, *sexual abuse symptoms do not reliably point to any one event, let alone precisely identify that event.*" See Myers, *ante,* at p. 449.

evidence. Cf. *Pierce v. State*, 777 S.W.2d 399 (Tex.Cr.App.1989) (Held, no error in refusing to admit expert testimony regarding suggestiveness of defendant's lineup).

I believe that any rational individual can conclude from what the majority opinion states, notwithstanding all of its faults, it is actually good news for those unemployed "experts" in this State who have been looking for employment either as State's or defendants' expert witnesses.

For the above reasons, I respectfully dissent.